# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP430-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |        Plaintiff-Respondent, |
| |    v. |
| | Patrick I. Hogan, |
| |        Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 354 Wis. 2d 622, 848 N.W.2d 903)
(Ct. App. 2014 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 10, 2105 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 4, 2015 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Grant |
| JUDGE: | Craig R. Day |

| JUSTICES: | |
|---|---|
| CONCURRED: | ZIEGLER, J., concurs. (Opinion Filed) |
| DISSENTED: | |
| NOT PARTICIPATING: | BRADLEY, ABRAHAMSON, J.J., dissent. (Opinion Filed.) |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Nicholas J. Passe* and *Moen Sheehan Meyer, Ltd.*, La Crosse, and oral argument by *Nicholas J. Passe*.


For the plaintiff-respondent, the cause was argued by *Tiffany M. Winter*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP430-CR
(L.C. No. 2012CF147)

STATE OF WISCONSIN  :  IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

  v.

Patrick I. Hogan,

      Defendant-Appellant-Petitioner.

**FILED**

**JUL 10, 2015**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals,[1] which affirmed a judgment convicting Patrick I. Hogan (Hogan) of possession of methamphetamine and child neglect. Hogan pled no contest to these charges after the Grant County Circuit Court[2] denied Hogan's motion to suppress evidence obtained during a search of his truck.

---

[1] State v. Hogan, No. 2013AP430-CR, unpublished slip op. (Wis. Ct. App. May 15, 2014).

[2] Craig R. Day, Judge.

¶2    This fact-intensive case focuses on the reasonableness of police conduct after a lawful traffic stop. After a sheriff's deputy stopped the defendant for a seat belt violation, the deputy observed what he believed to be indicia of the defendant's drug use. With this in mind, he called for backup. He then wrote out seat belt citations for the defendant and the defendant's wife, who was not wearing her seat belt properly. Before the deputy had finished the citations, a local officer who knew of the defendant arrived on the scene.

¶3    The officer reported that his department had received tips that the defendant had "961 issues" and was a "shake and bake" methamphetamine cooker.

¶4    With his suspicions about the defendant somewhat confirmed, the deputy asked the defendant to perform a series of field sobriety tests. When the defendant passed all tests, he was told he was free to leave. At this point about 24 minutes had elapsed from the time the deputy initiated the traffic stop.

¶5    Approximately 16 seconds later, the deputy re-approached the defendant and asked several questions, including whether the defendant would consent to a search of his truck. The defendant consented and the officers found methamphetamine, equipment and supplies commonly used to manufacture methamphetamine, and two loaded handguns. One gun was close to the defendant's two-year-old daughter, who was sitting in a child's car seat behind her mother in the back of the truck.

¶6    The defendant sought to suppress this evidence. Suppression hinges on the answer to three questions. First, did

2

the deputy have reasonable suspicion to extend a lawful traffic stop about seat belts to investigate whether the defendant was under the influence of drugs in the operation of his vehicle by having the defendant perform field sobriety tests?  Second, if the traffic stop was not lawfully extended to investigate drug use by the defendant, was the defendant's subsequent consent to search his truck tainted by prior illegality, so that the evidence seized was inadmissible?  Third, was the defendant constructively seized without reasonable suspicion when the deputy re-approached the defendant's vehicle to request consent to search?

¶7   The defendant argues that the deputy lacked reasonable suspicion to ask that the defendant perform field sobriety tests.  He contends that there were innocent explanations for the observations that the deputy made, and that the deputy was acting on nothing more than a hunch and unsubstantiated information from a fellow law enforcement officer.  The defendant further argues that the taint of an illegal extension affected the deputy's request for consent to search, rendering the consent invalid and all evidence obtained in the search inadmissible.  Finally, the defendant argues that he was constructively seized without reasonable suspicion when the deputy re-approached his vehicle to ask for consent to search.

¶8   The State counters that possible innocent explanations do not render the deputy's observations meaningless in analyzing the basis for reasonable suspicion.  The State also argues that, even if the extension was illegal, the stop ended when the

3

deputy told the defendant he was free to leave. The State argues the defendant was not seized within the meaning of the Fourth Amendment when the deputy asked him for consent to search his truck, and the defendant's consent was therefore valid. Alternatively, the State contends that any illegality was so attenuated from the defendant's consent that the taint of the illegality had dissipated by the time the defendant gave consent.

¶9 Although the question of whether the deputy had reasonable suspicion to extend the traffic stop to administer field sobriety tests is a close one, we conclude that the extension was unlawful based on the evidence presented. However, the defendant's subsequent consent to search his vehicle came after the traffic stop had ended and the defendant was told he was free to leave. Because the police did not exploit the unlawful extension of the stop in order to gain Hogan's consent to search his vehicle, attenuation analysis is unnecessary in this case. Furthermore, Hogan was not constructively seized when he gave consent to search his truck. We therefore conclude that the defendant's consent was valid and that it was not error for the circuit court to deny the defendant's motion to suppress the evidence recovered from his truck.

¶10 Accordingly, we affirm the decision of the court of appeals.

I. FACTUAL AND PROCEDURAL BACKGROUND

4

¶11 On May 12, 2012, Deputy Andrew Smith of the Grant County Sheriff's Department was driving his squad car north on Wisconsin Avenue in the City of Boscobel.  It was about 6:10 p.m.  Deputy Smith stopped at the corner of Wisconsin Avenue and Oak Street.  He saw a Chevrolet truck pass in front of him traveling east.  The driver, Patrick Hogan, was not wearing a seat belt.  Deputy Smith turned right and activated his emergency lights.  The truck promptly pulled to a stop in front of the Blaine Theatre.

¶12  When Deputy Smith approached the truck, he saw Hogan's wife in the front passenger seat.  She was wearing her seat belt improperly with the shoulder strap underneath her arm.  He also saw the couple's two-year-old child seated directly behind Mrs. Hogan in a child safety seat.

¶13  As soon as Deputy Smith began speaking with Hogan, he noticed that Hogan was "very nervous," "real nervous," and "shaking real bad" with upper body tremors.  He also noticed that Hogan's "pupils were restricted," which he believed was "an indicator of drug use."  Deputy Smith acknowledged later that he was not a drug recognition "expert" but said he based his observations on his 12-1/2 years experience as a deputy and his frequent review of a "pupilometer," which he described as "a little card that has different size black marks" which are "measured in millimeters."  The card was provided to him in connection with his field sobriety training.

¶14  Deputy Smith collected the licenses of both Mr. and Mrs. Hogan and returned to his squad.  He immediately requested

backup from Boscobel police and stressed his observations about Hogan's extreme nervousness and constricted pupils.

¶15  Shortly thereafter, the audio portion of the squad car video reflects a repeated announcement, "Warning, potential hit."  The record does not explain whether this announcement pertained to Hogan, who was on probation for second-degree reckless injury and had a number of other criminal convictions.

¶16  Before Deputy Smith completed the citations, he was joined by Boscobel Police Officer Travis Dregne.  Upon learning of Hogan's identity, Officer Dregne immediately remarked that Hogan had "961 issues," referring to the Wisconsin statutory chapter on controlled substances.  Officer Dregne also told Deputy Smith that "he received tips that Mr. Hogan's a shake and bake methamphetamine cooker."[3]  Deputy Smith then requested a police K9 unit via radio.

¶17  Upon learning that the K9 unit was unavailable, Deputy Smith determined that he would ask Hogan to perform field sobriety tests.  Approximately three minutes later, he completed the citations and printed them out.  A total of approximately 13 minutes had passed since Deputy Smith initiated the stop.

¶18  Deputy Smith then approached Hogan and asked him to step out of the truck.  He explained to Hogan that he had made observations that he thought were consistent with drug use.

---

[3] "Shake and bake" or "one pot" methamphetamine production is a manufacturing process used to produce small amounts of methamphetamine, often for personal use. See Raphael S. Nemes, Note, Shake and Bake: The Meth Threat and the Need to Rethink 21 U.S.C. § 841(C)(2), 88 Wash. U. L. Rev. 993, 999 (2011).

Hogan's quick response was "I don't use drugs." He then suggested that Deputy Smith's observations might be due to Hogan's use of Adderall, for which he said he had a prescription. Deputy Smith replied that Adderall does not cause the symptoms he was observing, and he asked Hogan if he would perform a series of field sobriety tests. Hogan complied.

¶19 Deputy Smith had Hogan perform four tests: the horizontal gaze nystagmus test, the walk and turn, the one leg stand, and the alphabet test. These tests took approximately eight minutes. Deputy Smith determined that Hogan did not show any signs of impairment and informed Hogan he was free to leave.

¶20 Hogan got back into his vehicle and closed the door but did not start the truck and leave, even though his house was across the street. Deputy Smith returned to his squad car and spoke with Officer Dregne. They discussed asking for a consent search. Approximately 16 seconds after Deputy Smith told Hogan he could leave, he returned to Hogan's stationary vehicle and said, "Hey, sir, can I talk to you again?"

¶21 Hogan got out of his truck. Deputy Smith asked Hogan if there were any weapons or drugs in the truck. Hogan replied that there were not. Deputy Smith then asked Hogan if he could search the vehicle. Hogan assented to Deputy Smith's request, motioning for Deputy Smith to take a look. Deputy Smith asked for verbal confirmation of Hogan's consent and Hogan replied "Why not. Yeah. Go ahead."

¶22 Deputy Smith and Officer Dregne searched Hogan's truck. Hogan's wife disclosed to Officer Dregne that she had a

7

handgun in her purse, but did not have a concealed carry permit. In addition to that gun——a .380 caliber Taurus semi-automatic pistol——they found a loaded Walther .22 caliber pistol behind the passenger seat near the couple's child.

¶23 Deputy Smith and Officer Dregne also recovered muriatic acid, two glass bottles containing clear liquids, and a medicine bottle bearing Hogan's name that contained a substance later identified as methamphetamine. The officers also recovered paraphernalia used to manufacture methamphetamine, including coffee filters, syringes, rubber gloves, and a heating canister. These items, including the loaded .22 pistol, were stored approximately one foot from the child.

¶24 On May 14, 2012, Hogan was charged with possession of methamphetamine, manufacturing methamphetamine, possession of a firearm by a felon, and child neglect.[4]

¶25 On June 12, 2012, Hogan filed a motion to suppress evidence from the search. He argued that any evidence recovered after Deputy Smith told him he could leave was illegally obtained because Deputy Smith seized Hogan for a second time when he re-approached Hogan's vehicle even though he lacked reasonable suspicion to do so. On the same day, Hogan filed a

---

[4] Contrary to Wis. Stat. §§ 961.41(3g)(g), 961.41(1)(e1), 941.29(2)(a), and 948.21(1)(a). All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

8

motion to dismiss, arguing that the State failed to preserve evidence material to his guilt or innocence.[5]

¶26 On June 21, 2012, Hogan filed another motion to suppress, this time arguing that the traffic stop was illegally extended when Deputy Smith required Hogan to perform field sobriety tests. Hogan based this contention on the premise that Deputy Smith lacked reasonable suspicion that Hogan was under the influence of drugs.

¶27 That same day, the circuit court denied Hogan's original motion to suppress the evidence from his truck. The court reasoned that Hogan had freely consented to a search of his vehicle and therefore it was not an unlawful extension of the stop. However, the court expressed uncertainty about whether the field sobriety tests were a lawful extension of the original stop, and requested informal briefing on the matter.

¶28 The circuit court denied Hogan's second motion on July 10, 2012. Although the court determined that Deputy Smith illegally extended the stop when he administered the field sobriety tests, it concluded that Hogan's subsequent consent sufficiently tempered the illegality of the extension and that suppression was not necessary.

¶29 On July 27, 2012, Hogan pled no contest to possession of methamphetamine and child neglect. As part of the plea agreement, the State dismissed the charges for manufacturing

---

[5] This issue has not been argued before this court, and we do not address it.

methamphetamine, possession of a firearm by a felon, and the seat belt citation.  The court found Hogan guilty and entered a judgment of conviction on September 27.

¶30  On October 12, 2012, Hogan gave notice of his intent to seek postconviction relief from the orders denying his motions to dismiss and suppress.  On May 15, 2014, the court of appeals affirmed the conviction and the circuit court's denial of the motions.  State v. Hogan, No. 2013AP430-CR, unpublished slip op. (Wis. Ct. App. May 15, 2014).  The court reasoned that Hogan was not constructively seized when Deputy Smith conducted a search of his vehicle.  Id., ¶12.  The court also affirmed the circuit court's ruling that Hogan's consent "was sufficiently attenuated from the taint of the illegal detention."  Id., ¶19.

¶31  On June 16, 2014, Hogan filed a petition for review with this court, which we granted on November 13, 2014.

## II. STANDARD OF REVIEW

¶32  Whether a defendant's constitutional rights, including his rights under the Fourth Amendment, have been violated is a question of constitutional fact.  Resolving questions of constitutional fact is a two-step process.  State v. Martwick, 2000 WI 5, ¶17, 231 Wis. 2d 801, 604 N.W.2d 552.  We first uphold the circuit court's findings of historical fact unless they are clearly erroneous.  Id., ¶18.  We then independently apply constitutional principles to those facts.  Id.

## III. DISCUSSION

¶33  This case requires us to analyze different segments of an extended traffic stop.  The evidence that the defendant seeks

10

to suppress was not acquired until a third distinct period of the stop about 28 minutes after its initiation.

## A. Extension of the Stop

¶34 The Fourth Amendment to the U.S. Constitution protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. "There is no question that a police officer may stop a vehicle when he or she reasonably believes the driver is violating a traffic law . . . ." State v. Betow, 226 Wis. 2d 90, 93, 593 N.W.2d 499 (Ct. App. 1999) (citing United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995)). However, "a traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a . . . ticket." Rodriguez v. United States, 575 U.S. ___, 135 S. Ct. 1609, 1614-15 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

¶35 After a justifiable stop is made, the officer may expand the scope of the inquiry only to investigate "additional suspicious factors [that] come to the officer's attention." Betow, 226 Wis. 2d at 94 (citing United States v. Perez, 37 F.3d 510, 513 (9th Cir. 1994)). See also State v. Gammons, 2001 WI App 36, ¶¶18-19, 214 Wis. 2d 296, 625 N.W.2d 623. An expansion in the scope of the inquiry, when accompanied by an extension of time longer than would have been needed for the original stop, must be supported by reasonable suspicion. See State v. Colstad, 2003 WI App 25, ¶13, 260 Wis. 2d 406, 659 N.W.2d 394. See also Navarette v. California, 572 U.S. ___, 134 S. Ct. 1683, 1687 (2014); Terry v. Ohio, 392 U.S. 1, 21-22 (1968). In this

11

regard, the legal extension of a traffic stop is essentially a Terry investigatory stop. State v. Arias, 2008 WI 84, ¶35, 311 Wis. 2d 358, 752 N.W.2d 748.

¶36 "The focus of an investigatory stop is on reasonableness, and the determination of reasonableness depends on the totality of circumstances . . . ." State v. Richardson, 156 Wis. 2d 128, 139, 456 N.W.2d 830 (1990). Although officers sometimes will be confronted with behavior that has a possible innocent explanation, a combination of behaviors——all of which may provide the possibility of innocent explanation——can give rise to reasonable suspicion. See United States v. Arvizu, 534 U.S. 266, 274-75 (2002).

¶37 It follows that the legality of the extension of the traffic stop in this case turns on the presence of factors which, in the aggregate, amount to reasonable suspicion that Hogan committed a crime the investigation of which would be furthered by the defendant's performance of field sobriety tests. See State v. Post, 2007 WI 60, ¶10, 301 Wis. 2d 1, 733 N.W.2d 634.

¶38 In his incident report, Deputy Smith explained the basis for extending the stop: "Based upon Patrick shaking and his pupils being restricted, I asked him if he would be willing to attempt some field sobriety tests and he indicated he would."

¶39 Hogan's post-arraignment motions challenged the sufficiency of this explanation as well as the sufficiency of the deputy's observations at the preliminary hearing——"he was very nervous, shaking, and his pupils were restricted"——as

12

providing reasonable suspicion to extend the stop to perform field sobriety tests.

¶40 At the subsequent motion hearing, Deputy Smith testified at greater length and the State's evidence included video of the entire incident taken from the deputy's squad car and audio of the deputy's statements and discussions with others. At the conclusion of the hearing, Judge Day asked for letter briefs.

¶41 In his brief, the assistant district attorney did not emphasize reasonable suspicion for the field sobriety tests as much as he emphasized Hogan's consent to search, and he did not rely on information the Boscobel police officer gave to Deputy Smith about Hogan as an important element of the reasonable suspicion for the tests. Hogan's attorney said a bit more about Officer Dregne's statements but he pointedly observed that "Officer Dregne . . . had heard (from some unknown source) that the defendant had a drug history." (Emphasis added.)

¶42 Judge Day concluded that the field sobriety tests were "an unlawful extension of the stop." He attributed no "power or persuasive force to Deputy Smith's observation of [Hogan's] pupils," saying it "doesn't mean anything on this record." He did not refer to the deputy's acquired information about Hogan's alleged "961 issues" or his alleged involvement with methamphetamine.

¶43 Upon careful examination of the record, we believe the State could have made a valid case that Deputy Smith had reasonable suspicion to pursue field sobriety tests with Patrick

13

Hogan. However, the case the State could have made in circuit court was not made, and, consequently, Judge Day's ruling on this point was not error.

¶44 We review the totality of the circumstances to illustrate the problems.

¶45 There was no evidence and no suspicion that Hogan was driving under the influence of alcohol. There also was no evidence that Hogan's driving had been impaired by drugs. The deputy's observations suggested that Hogan might have been using drugs and thus might have violated Wis. Stat. § 346.63(1)(am), which makes it illegal for a person to drive or operate a motor vehicle with "a detectable amount of a restricted controlled substance in his or her blood." As a result, the issue presented to the circuit court was whether there was reasonable suspicion that Hogan had been using controlled substances recently enough that evidence of that use would be detected in his blood.

¶46 Any order for a blood test would require probable cause. State v. Tullberg, 2014 WI 134, ¶31, 359 Wis. 2d 421, 857 N.W.2d 120. Field sobriety tests were intended to secure evidence to establish probable cause.

¶47 Deputy Smith was an experienced officer with 12-1/2 years of service in the Grant County Sheriff's Department. His experience should have been a plus. State v. Meyer, 216 Wis. 2d 729, 752-53, 576 N.W.2d 260 (1998). His instincts were, in fact, correct. However, Deputy Smith conceded that he was not a drug recognition expert and his testimony about restricted

14

pupils undermined his credibility in the court's eyes. The court heard the following testimony on cross-examination:

Q:    You also indicated that you observed his pupils to be restricted, right?

A:    Yes, sir.

Q:    Okay.  Was it sunny out that day?

A:    Yes, sir.

Q:    And pupils restrict when it's sunny?

A:    Yes, sir.

Q:    You're not a drug recognition expert, right?

A:    Correct.

Q:    What drugs cause pupil restrictions?

A:    Cocaine being one.  I'm sure there's others, but I'm not a drug recognition expert.

Q:    Do you know what methamphetamine does to pupils?

A:    No, sir.

Q:    Okay.  Approximately what size do you believe Mr. Hogan's pupils were?

A:    Three millimeters.

.  .  .  .

Q:    [D]o you know what the normal pupil size is for an adult male?

A:    Four to five millimeters, I believe.

¶48  For a variety of reasons, the circuit court put no stock in the deputy's testimony about restricted pupils as a factor in establishing reasonable suspicion.  The deputy did not have definitive information at any point on how drug use might

affect pupil size.[6]    He referred to his familiarity with a pupilometer card but he did not bring the card to substantiate or supplement his testimony.

¶49 Consequently, the case for reasonable suspicion rests primarily on the deputy's observations that Hogan's upper body was shaking and "he appeared to be very nervous."  These points appear in his suppression hearing testimony and are even more prominent in the audio that accompanies the video.

¶50 Nervousness, anxiety, and tremors are consistent with methamphetamine use.    National Highway Traffic Safety Administration, Drugs and Human Performance Fact Sheets, Report No. DOT HS 809 725, at 63 (April 2014).  These characteristics, however, may also have innocent explanations.  The possibility that innocent explanations may exist for observed behavior does not preclude a finding of reasonable suspicion, but as a practical matter, police cannot expect to conduct field sobriety tests on every motorist who is shaking and nervous when stopped by an officer.

¶51 Officer Dregne's comments that Hogan had "961 issues" and that Officer Dregne had "received tips that Mr. Hogan's a shake and bake methamphetamine cooker" undoubtedly influenced

---

[6] In fact, during the course of the discussion about pupil size, Deputy Smith suggested that restricted pupils are consistent with cocaine use.  However, according to a source cited by the State, cocaine use may lead to dilated pupils, not restricted pupils.  See National Highway Traffic Safety Administration, Drugs and Human Performance Fact Sheets, Report No. DOT HS 809 725, at 21 (April 2014).

Deputy Smith's decision to proceed as he did.  At least some of Deputy Smith's observations meshed with Officer Dregne's information.  Ultimately, however, when a court is asked to rule on a suppression motion, the court must evaluate whether the information conveyed by a fellow officer, and relied upon in taking the action under review, was reliable information, because the officer conveying the information had either firsthand knowledge or a reliable informant.  No effort was made in this case to show that Officer Dregne's tips came from a reliable informant.[7]  Such an effort, if successful, would have made a substantial difference in establishing reasonable suspicion.

¶52 The audio from the incident several times records an urgent announcement, perhaps from the squad computer: "Warning, potential hit."  These announcements are never referred to in the testimony or the argument, so that their import and

---

[7] To assess the reliability of an anonymous tip, a totality of the circumstances test is used. Illinois v. Gates, 462 U.S. 213, 230-31 (1983).  Courts must take into account the quantity and quality of information received during this analysis. Alabama v. White, 496 U.S. 325, 330 (1990).  The quantity and quality are inversely proportionate: if one is relatively low, the other must be relatively high for the tip to be deemed reliable. Id.  Courts consider such factors as awareness of the informant's identity, an officer's past interactions with the informant, and predictive information offered in the tip. See United States v. Am, 564 F.3d 25 (1st Cir. 2009); United States v. Crozier, 777 F.2d 1376, 1389 (9th Cir. 1985); State v. Richardson, 156 Wis. 2d 128, 456 N.W.2d 830 (1990).

Officer Dregne's informant may not have been anonymous and may have been completely reliable, but any such facts are not in evidence.

relationship to Hogan, if any, are unknown. If either Deputy Smith or Officer Dregne had been shown to know of Hogan's criminal record, which included three felony convictions and a drug conviction as well as his probationary status, the case for reasonable suspicion would have been greatly strengthened. After all, Hogan's statement to Deputy Smith that "I don't do drugs" could have been challenged, and Hogan's immediate explanation that Deputy Smith's observations could be attributed to Hogan's use of prescription Adderall could have been viewed even more skeptically because of background information from reliable sources.

¶53 Reasonable suspicion here is a close question. But the State's failure to tie up loose ends in circuit court should not be rewarded just because the case is close. As a result, we will not disturb the circuit court's conclusion that the extension of the stop for field sobriety tests was not lawful.

## B. Consent to Search

¶54 Our determination that the extension of the traffic stop was not lawful, based on the record before us, does not resolve this case. The somewhat unusual feature of the case is that the evidence Hogan seeks to suppress was not obtained as a result of the field sobriety tests but rather as a result of the consensual search of Hogan's vehicle.

¶55 "Warrantless searches are per se unreasonable under the Fourth Amendment." State v. Williams, 2002 WI 94, ¶18, 255 Wis. 2d 1 (2002). However, one of the "specifically established and well-delineated" exceptions to the warrant requirement is

18

consent; if an individual freely gives consent for police to search his or her vehicle, the police may do so without a warrant. Id.

¶56 Hogan does not dispute that he gave his consent for Deputy Smith to search his truck. Instead, Hogan argues that his illegal detention immediately prior to his consent tainted the consent and Deputy Smith was therefore not excused from obtaining a warrant to search Hogan's vehicle.

¶57 Consent analysis proceeds under a distinct framework if consent was given following some illegal action by police. Consent, even when voluntary, is not valid when obtained through exploitation of an illegal action by police. State v. Phillips, 218 Wis. 2d 180, 204 (1998). Stated differently, "[w]hen . . . consent to search is obtained after a Fourth Amendment violation, evidence seized as a result of that search must be suppressed as 'fruit of the poisonous tree' unless the State can show a sufficient break in the causal chain between the illegality and the seizure of evidence." Id.

¶58 Attenuation analysis examines three factors to determine whether consent is sufficiently attenuated from illegal action to be removed from the taint of illegality: "(1) the temporal proximity of the official misconduct and seizure of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." Phillips, 218 Wis. 2d at 206 (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)). The application of these factors will vary on a case-by-case basis. Our focus here is determining whether

19

these factors sufficiently safeguard constitutional protections when the illegal action is the unlawful extension of a traffic stop.

¶59 Hogan suggests that the third factor is inappropriate in this analysis because the "subjective intent of . . . law enforcement officers is irrelevant to whether . . . officers are unfairly benefitting from the violation of . . . suspects' rights." Hogan further contends that the focus in the attenuation analysis should be on why the individual gave consent. He offers a hybrid test that combines the first two factors from Phillips with a constructive seizure analysis like that in Williams.

¶60 Considering the closeness of this case with regard to reasonable suspicion, it is no surprise that Hogan downplays the importance of the third factor, i.e., the purpose and flagrancy of the official misconduct. While flagrant violations of the law by police should weigh against the validity of any subsequent consent, see United States v. Edmons, 432 F.2d 577 (2d Cir. 1970), the mere failure to establish reasonable suspicion because the State did not submit all the evidence that it had available is a different matter.

¶61 Hogan's desired focus on why a person gives consent implicates questions of voluntariness. Involuntary consent is invalid, regardless of any prior illegality or attenuation therefrom. See State v. Vorburger, 2002 WI 105, ¶89, 255 Wis. 2d 537, 648 N.W.2d 829 (citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973)). Attenuation analysis is not voluntariness

20

analysis, and it is not meant to cure the involuntary waiver of rights. Rather, attenuation analysis examines whether voluntary consent is tainted by prior illegality. Phillips, 218 Wis. 2d at 204-05.

¶62 Viewed in this light, we conclude that the attenuation test laid out in Phillips is the proper test to apply for analyzing voluntary consent to search a vehicle when that consent comes after the illegal extension of a traffic stop. The three Phillips factors adequately protect the rights of motorists in such situations. In many ways, the concept of constructive seizure——which Hogan argues should be included in the analysis——is already built into the Phillips attenuation test.

¶63 We have held that a traffic stop ends when a reasonable person, under the totality of the circumstances, would feel free to leave. Williams, 255 Wis. 2d 1, ¶35. Given the wide range of possible "circumstances" in a traffic stop, it is not possible to expound a bright-line rule of when the reasonable driver would feel free to leave. However, it is not uncommon for officers to tell drivers they are "free to leave," may be "on their way," or to "have a nice day" at the conclusion of a traffic stop.

¶64 The end of a traffic stop is important to two of the factors in the attenuation analysis. First, the circumstances giving rise to the end of a traffic stop will often (though perhaps not always) include the passage of time, which implicates the first attenuation factor. Second, and more

21

important, the end of a traffic stop is a <u>significant</u> intervening event for purposes of attenuation analysis.

¶65 Thus, Hogan's proposed hybrid attenuation test is unnecessary because it would focus on improper factors while placing redundant value on other factors. We see no reason to replace the <u>Phillips</u> attenuation analysis in this context.

¶66 It is important to note that attenuation analysis may not be necessary in all cases. "[A]ttenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal governmental activity.'" <u>New York v. Harris</u>, 495 U.S. 14, 19 (1990) (citation omitted). If the unlawful police conduct was not a "but-for" cause of the search, attenuation analysis is unnecessary because the consent is not tainted by the unlawful conduct in such a case. <u>See</u> <u>Hudson v. Michigan</u>, 547 U.S. 586, 592 (2006).

¶67 After a traffic stop has ended, police may interact with the driver as they would with any citizen on the street. <u>See</u> <u>Williams</u>, 255 Wis. 2d 1, ¶35. That is, if a person is not seized, police may request consent to search even absent reasonable suspicion. <u>See</u> <u>Florida v. Bostick</u>, 501 U.S. 429, 431 (1991). In a sense, the end of a traffic stop places the officer and driver back on equal footing, with the driver free to leave if he wishes (because if the driver were not free to leave, the traffic stop would not in fact have ended).

¶68 Given the myriad possible scenarios in which police and the public may interact on the side of the road, we cannot

22

postulate that the end of a traffic stop will always render attenuation analysis unnecessary. However, the end of the stop will be a significant factor in determining the necessity of attenuation analysis, at the very least.

¶69 In this case, we conclude that the end of the traffic stop does render attenuation analysis unnecessary because it cannot be said that the extension of the stop was a but-for cause of Hogan's consent. Deputy Smith told Hogan that he was free to leave, encouraged him to wear his seat belt, and advised him to get his windshield fixed. He then returned to his squad car. Deputy Smith waited approximately 16 seconds before re-engaging Hogan. When we compare these facts to the facts in Williams,[8] we have little trouble concluding that Hogan was not constructively seized at the time Deputy Smith requested his consent to search the vehicle. A reasonable person, under the totality of the circumstances, would have felt free to leave——to drive across the street to his home.

---

[8] In Williams, a police officer stopped the defendant's vehicle for a traffic violation, for which the officer issued a warning. The defendant signed the warning, the two shook hands, and the officer told the defendant in a conversational tone he could "get on [his] way." State v. Williams, 2002 WI 94, ¶¶9-12, 255 Wis. 2d 1, 646 N.W.2d 834. After taking two steps toward his squad car, the officer asked for and was granted consent to search the vehicle, where the officer found heroin and a weapon. Id., ¶12-13. This court determined the officer's words and actions, considered as a whole, communicated permission to leave and, therefore, the defendant was no longer seized after the officer stated the defendant could "get on his way." Id., ¶29. Because a reasonable person would have felt able to leave the scene, the officer's subsequent questioning did not constitute a seizure for purposes of the Fourth Amendment and the defendant's consent was valid. Id., ¶28.

¶70 It is true that the emergency lights on Deputy Smith's squad car remained on for the entire duration of the stop, including the time in which Deputy Smith re-engaged Hogan. However, that alone is not enough for us to conclude that the stop had not ended. Police often may leave their emergency lights on for safety reasons when they and the motorist are pulling back onto the roadway after a traffic stop. The continuing illumination of the emergency lights was not enough to create an ongoing——or new——seizure of Hogan.

¶71 We therefore conclude that even though the extension of the traffic stop has been deemed illegal, the extension of the stop was not a but-for cause of the consent. The traffic stop had concluded. Hogan had returned to his truck and was free to leave. He gave consent to search after Deputy Smith re-approached him and asked for consent.

¶72 Our conclusion that Hogan was not constructively seized when Deputy Smith requested consent to search Hogan's truck also resolves Hogan's argument that his consent was invalid because it occurred during a constructive seizure initiated without reasonable suspicion. As discussed above, without a constructive seizure, police do not need reasonable suspicion to request consent to search. See Bostick, 501 U.S. at 431.

¶73 Because Hogan's rights were not violated, it was not error for the circuit court to deny his motions to suppress.

IV. CONCLUSION

24

¶74 Although the question of whether the deputy had reasonable suspicion to extend the traffic stop to administer field sobriety tests is a close one, we conclude that the extension was unlawful based on the evidence presented. However, the defendant's subsequent consent to search his vehicle came after the traffic stop had ended and the defendant was told he was free to leave. Because the police did not exploit the unlawful extension of the stop in order to gain Hogan's consent to search his vehicle, attenuation analysis is unnecessary in this case. Furthermore, Hogan was not constructively seized when he gave consent to search his truck. We therefore conclude that the defendant's consent was valid and that it was not error for the circuit court to deny the defendant's motion to suppress the evidence recovered from his truck.

¶75 Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶76 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join the majority opinion. I write separately to note that, had the circuit court determined that the facts were as the State asserts, I would engage in the analysis that I put forth in my concurrence in State v. Blatterman. See State v. Blatterman, 2015 WI 46, 362 Wis. 2d 138, 864 N.W.2d 26 (Ziegler, J., concurring) (arguing that, because a prohibited alcohol concentration violation under Wis. Stat. § 346.63(1)(b) does not require proof of impairment, standard field sobriety tests are of limited value for determining whether a driver violated this statute).

¶77 In the present case, Deputy Andrew Smith suspected Patrick Hogan of operating a motor vehicle with a detectable amount of a restricted controlled substance in his blood, contrary to Wis. Stat. § 346.63(1)(am). This offense does not require proof of impairment. State v. Smet, 2005 WI App 263, ¶23, 288 Wis. 2d 525, 709 N.W.2d 474. This offense has two elements: (1) the defendant drove or operated a motor vehicle on a highway; and (2) the defendant had a detectable amount of a restricted controlled substance in his or her blood at the time the defendant drove or operated a motor vehicle. See Wis. Stat. § 346.63(1)(am); Wis. JI—Criminal 2664B. Although poor performance on standard field sobriety tests would support a determination that there is probable cause to arrest someone who is suspected of violating § 346.63(1)(am), operators may violate this statute even though they are able to pass standard field sobriety tests. Accordingly, whether a driver who violates this

statute is brought to justice might often depend on whether there is probable cause to arrest the driver and take him or her to a hospital for further testing, regardless of how he or she performs on standard field sobriety tests. In the present case, the circuit court's findings of fact do not allow me to engage in this type of analysis.

¶78 For the foregoing reasons, I respectfully concur.

¶79 ANN WALSH BRADLEY, J. *(dissenting).* I agree with the majority that "[c]onsent analysis proceeds under a distinct framework if consent was given following some illegal action by police. Consent, even when voluntary, is not valid when obtained through exploitation of an illegal action by police." Majority op., ¶57.

¶80 I also agree that "[w]hen . . . consent to search is obtained after a Fourth Amendment violation, evidence seized as a result of that search must be suppressed as 'fruit of the poisonous tree' unless the State can show a sufficient break in the causal chain between the illegality and the seizure of evidence." Id. (quoting State v. Phillips, 218 Wis. 2d 180, 204, 577 N.W.2d 794 (1998)) (alteration in majority).

¶81 I part ways with the majority, however, when it comes to the necessity of conducting an attenuation analysis. The majority concludes that it is unnecessary "[b]ecause the police did not exploit the unlawful extension . . . to gain Hogan's consent." Majority op., ¶9. Yet, the very purpose of an attenuation analysis is to determine whether the evidence objected to was obtained by exploitation of a prior police illegality.

¶82 Contrary to the majority's assertions, this case presents the quintessential example of when an attenuation analysis is needed. It is undisputed that the extension of the traffic stop was unconstitutional. The deputy reengaged Hogan a mere 16 seconds later, seeking consent to search.

1

¶83 Where consent is obtained so closely on the heels of acknowledged police misconduct, attenuation analysis is the means by which we determine "whether the evidence objected to was obtained by exploitation of a prior police illegality or instead by means sufficiently attenuated so as to be purged of the taint." State v. Anderson, 165 Wis. 2d 441, 447-48, 477 N.W.2d 277 (1991).

¶84 In this case an attenuation analysis reveals that the taint from the deputy's unconstitutional actions was not removed. Therefore the evidence obtained from that search must be suppressed. Accordingly, I respectfully dissent.

I

¶85 The majority spends a substantial portion of its analysis attempting to re-litigate the facts of this case to determine whether the extension of the traffic stop was unconstitutional. Majority op., ¶¶38-52. Ultimately, it acquiesces, as it must, to the conclusion reached by the circuit court and the court of appeals——the extension of the stop was illegal. Id., ¶53.

¶86 Acknowledging that designating the extension unlawful does not resolve the case, the majority turns its focus to whether Hogan's consent for the search was tainted by the extension. Id., ¶56. It observes that consent "is not valid when obtained through exploitation of an illegal action by police." Id., ¶57. It then explains that "[a]ttenuation analysis examines three factors to determine whether consent is sufficiently attenuated from illegal action to be removed from

2

the taint of illegality." Id., ¶58. This statement is followed by a lengthy discussion of those three factors. Id., ¶¶58-65.

¶87 Abruptly shifting paths, the majority fails to apply the three factors. Instead, it considers whether a person in Hogan's position would have felt free to leave after the unlawful extension of the traffic stop. Id., ¶63. It determines that a reasonable person would have felt free to leave due to the deputy's statement: "you're free to go." See id., ¶69. Based on this rationale, the majority sets aside the preceding illegality in the traffic stop and determines that an attenuation analysis is unnecessary. It states: "[b]ecause the police did not exploit the unlawful extension of the stop in order to gain Hogan's consent to search his vehicle, attenuation analysis is unnecessary in this case." Id., ¶9. Without conducting an attenuation analysis, the majority ultimately concludes that Hogan's consent to the search was valid. Id., ¶¶69, 71.

II

¶88 In asserting a reasonable person would have felt free to leave after the unlawful extension of the traffic stop, the majority constructs a fiction.

¶89 Hogan had been pulled over for not wearing his seatbelt. After the deputy checked Hogan's license and registration, he asked Hogan to step out of his vehicle. Despite Hogan's clear agitation and expressed desire to go home, the deputy prolonged the stop to such an extent that it constituted an unconstitutional extension of the stop when he

3

asked Hogan to perform multiple sobriety tests. After the tests were completed, the Deputy told Hogan he was free to leave.

¶90 However, sixteen seconds after Hogan got back into his vehicle, with the lights on the patrol car still flashing, the deputy walked back to the defendant and reengaged. After asking for and receiving Hogan's consent to search, the deputy found methamphetamine, drug paraphernalia, and two loaded guns in Hogan's vehicle.

¶91 Like United States Supreme Court Justice Souter, I have a hard time imagining that an average individual would believe that he has nothing to lose if he refuses to cooperate with the police or that he had any free choice to ignore the police altogether. United States v. Drayton, 536 U.S. 194, 212 (2002) (Souter, J., dissenting) ("It is very hard to imagine that either [defendant] would have believed that he stood to lose nothing if he refused to cooperate with the police, or that he had any free choice to ignore the police altogether. No reasonable passenger could have believed that, only an uncomprehending one.").

¶92 The reasonable person "free to leave" standard bears little relationship to what individuals actually believe:

> Courts and scholars have repeatedly noted that the free-to-leave test is a highly unrealistic judicial construct that stretches credulity to its limits in assuming that any reasonable person (young or old; guilty or innocent) would literally feel free to leave and ignore a police officer's questions without consequence.

Jonathan S. Carter, You're Only as "Free to Leave" as You Feel: Police Encounters with Juveniles and the Trouble with

4

Differential Standards for Investigatory Stops In Re I.R.T., 88 N.C. L. Rev. 1389, 1410-11 (2010); see also Cty. of Grant v. Vogt, 2014 WI 76, ¶31 n.14, 356 Wis. 2d 343, 850 N.W.2d 253 ("To some extent, the 'reasonable person' here is a legal fiction. That defendants often consent to searches of areas that reveal incriminating evidence demonstrates that people often do not feel free to decline an officer's request, even absent a manifest show of authority.").

¶93 "[E]mpirical studies over the last several decades on the social psychology of compliance, conformity, social influence, and politeness have all converged on a single conclusion: the extent to which people feel free to refuse to comply is extremely limited under situationally induced pressures." Janice Nadler, No Need to Shout: Bus Sweeps and the Psychology of Coercion, 2002 Sup. Ct. Rev. 153, 155. As Professor LaFave has observed "only the most thick-skinned of suspects" would feel free to leave in some of the circumstances that the Court has found such a freedom. Wayne R. LaFave, Pinguitudinous Police, Pachydermatous Prey: Whence Fourth Amendment "Seizures?", 1991 U. Ill. L. Rev. 729, 739-40.

¶94 In the present case, the very nature of the stop was coercive. The deputy necessarily displayed his power and the accoutrements of his authority in order to get Hogan to pull over his vehicle. Once there, the deputy used his authority to require Hogan's compliance with unconstitutional sobriety tests, while another officer looked on. There was no real break between this series of events and the deputy's request to search

Hogan's vehicle. Although the deputy told Hogan he was free to leave, within a mere 16 seconds, he reengaged seeking consent to search Hogan's vehicle.

III

¶95 The majority's suggestion that Hogan's consent to search his vehicle was unrelated to the illegality is also unpersuasive. Would a reasonable person in Hogan's situation, who is on probation and aware that there was methamphetamine, drug paraphernalia, and two loaded guns in his vehicle, blithely consent to a search of his vehicle absent the presence of coercion? The answer is no. The illegal extension of the traffic stop unquestionably played a role in Hogan's consent.

¶96 An application of attenuation analysis demonstrates that the consent was not so attenuated from the illegality to render it free of the taint from the unconstitutional extension of the traffic stop.

¶97 Attenuation analysis is well-established in our jurisprudence. Originating in the United States Supreme Court, it was developed to help courts determine whether evidence obtained following illegal police activity must be excluded as the fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 488 (1963). The Court set forth the relevant inquiry as follows: "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. (quoting Maguire, Evidence of Guilt, 221 (1959)).

6

¶98 In Brown v. Illinois, 422 U.S. 590, 603-04 (1975), the Supreme Court declined to adopt a "but for" approach based on a causal connection, and announced instead three factors that courts should consider in determining if evidence was sufficiently attenuated from the initial illegality to purge it of the primary taint: temporal proximity, the presence of intervening circumstances, and the flagrancy of the misconduct.

¶99 I address each factor in turn:

¶100 The first factor, temporal proximity, requires a consideration of "both the amount of time between the illegal [act] and the consensual search and the conditions that existed during that time." Phillips, 218 Wis. 2d at 206.

¶101 Sixteen seconds elapsed between the unconstitutional extension of the stop and the time the deputy reengaged Hogan seeking consent to search. In assessing temporal proximity, we have previously determined that the timespan of a few minutes weighs against a consensual search. Id.; see also United States v. Macias, 658 F.3d 509, 524 (5th Cir. 2011) (thirty-second interval between illegal extension of traffic stop and request for consent weighed against attenuation); United States v. Gregory, 79 F.3d 973, 979-80 (10th Cir. 1996) (passage of less than a minute between return of driver's license and request to search not sufficient to purge the taint of an illegal stop); McGaughey v. State, 37 P.3d 130, 141 (Okla. Crim. App. 2001) (the fact that only a few minutes had passed between the illegal detention and the request for consent to search "weigh[ed] heavily against finding the taint cleansed").

7

¶102 The United Stated Supreme Court has stated that in some circumstances even a 45-minute timespan would be insufficient to purge the taint. Rawlings v. Kentucky, 448 U.S. 98, 107 (1980). Here, we are considering a mere 16 seconds that passed between the illegal extension of the stop and the deputy's reengagement, seeking consent to search Hogan's vehicle. Such an abbreviated timespan weighs against attenuation.

¶103 In considering temporal proximity, courts take into account the conditions that existed. Admittedly, in some circumstances, the existence of a congenial atmosphere may weigh in favor of attenuation. See Rawlings, 448 U.S. at 109. In this case it does not. Although the atmosphere during the encounter was not overtly threatening, Hogan appeared agitated throughout the stop, expressing his desire to leave. It was only the deputy's assertion of authority that kept him there. The extension of the stop further enhanced the unequal power dynamic between the deputy and Hogan. Far from removing the taint of the illegality, the conditions of the illegal extension of the stop combined with the short time span between the extension and the consent suggest that the consent was tainted by the illegality.

¶104 The second factor, intervening circumstances, refers to events occurring between the illegality and the consensual search. Phillips, 218 Wis. 2d at 208. In this case, after the extension of the stop, the deputy told Hogan that he was free to leave and they both returned to their vehicles. Although these

8

circumstances are significant as they could be viewed as an end of the traffic stop, they are not sufficient to wipe clean the slate such that the consent was untainted by the illegality.

¶105 This court described what intervening circumstances would support a determination of attenuation in Phillips, 218 Wis. 2d 180. In that case, after illegally entering the defendant's home, officers had a short discussion with the defendant. An officer informed the defendant that they had received information that the defendant had drug paraphernalia and marijuana and explained that they did not have a warrant to search his bedroom. Id. at 209. "This discussion was significant [] because it provided the defendant with sufficient information with which he could decide whether to freely consent to the search." Id. at 208-09. We stated that the discussion "illustrates that the defendant was not improperly surprised, frightened, or confused when he consented to the search of his bedroom," and thus concluded that the officers did not exploit their unlawful entry to obtain consent to search. Id. at 209.

¶106 The circumstances in Phillips are not present in this case. At no time did the deputy give any indication that Hogan could decline the deputy's request to search his vehicle. Indeed, during the unlawful extension of the stop, Hogan expressed his belief that if he did not accede to the deputy's requests, it would be used against him. Nothing in the deputy's request for consent to search the vehicle would have dispelled that belief. The intervening circumstances do not remove the taint from the unlawful extension of the stop.

9

¶107 The third factor to consider is "the purpose and flagrancy of the official misconduct." Id. This factor considers whether the conduct of the officers rose "to the level of conscious or flagrant misconduct requiring prophylactic exclusion." Anderson, 165 Wis. 2d at 451 (quoting Rawlings, 448 U.S. at 110).

¶108 The deputy's conduct indicates a conscious attempt to gain consent for the search. His exchange with the other officer at the scene suggests that the entire purpose of extending the stop was to find a reason to search Hogan's vehicle. Seeking consent to search is generally consistent with exemplary work of law enforcement. Detaining a suspect longer than reasonably justified by the stop in order to obtain consent crosses the line. I acknowledge, however, that the deputy may not have realized that the extension of the stop was unlawful. Thus, it is hard to conclude that his conduct was flagrant. Overall, this factor appears neutral in determining attenuation.

¶109 Having considered the three traditional factors of an attenuation analysis, I conclude that on balance, they weigh against a determination of attenuation. Although the third factor appears neutral, both the first and second factors weigh against it. The facts of this case and the relevant case law reveal that there was no real break between the unconstitutional extension of the traffic stop and the deputy's request for consent to search Hogan's vehicle.

IV

¶110 Although officers may conduct brief seizures when there is reasonable suspicion of a traffic violation, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). As the majority acknowledges, an officer may not extend the stop without additional reasonable suspicion. Majority op., ¶35. Absent such reasonable suspicion, the prolonged detention becomes an unlawful seizure, intruding on the citizen's personal liberty.

¶111 Here, consent to search Hogan's vehicle was sought only seconds after the illegal extension of the traffic stop. To conclude that consent obtained so closely on the heels of acknowledged police misconduct was valid would lend an air of legitimacy to questionable police tactics. This is the classic example of when the exclusionary rule should apply. See State v. Scull, 2015 WI 22, ¶22, 361 Wis. 2d 288, 862 N.W.2d 562 (observing that the two rationales for the exclusionary rule are "assurance of judicial integrity and deterrence of unlawful police conduct"). The evidence should have been suppressed.

¶112 Accordingly, for the reasons set forth above, I respectfully dissent.

¶113 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

11