REILLY, P.J. (concurring).
¶26 I respectfully concur, but I do so because I must. See *173 Cook v. Cook , 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997). Under State v. Wright , 2019 WI 45, 386 Wis. 2d 495, 926 N.W.2d 157, and State v. Floyd , 2017 WI 78, 377 Wis. 2d 394, 898 N.W.2d 560, our Fourth Amendment protection against warrantless searches and seizures when stopped on the roadway has been eliminated. Wright and Floyd hold that "we need not determine whether reasonable suspicion supported the requests to exit the car and for consent to search during the lawful traffic stop" as "the requests were part of the mission of the traffic stop, and thus were not an extension of the stop." Majority, ¶17. The result is that officers will be trained to testify that they extended the seizure for purposes of their safety or that they worked quickly[1] to avoid "measurably extend[ing]" *896 the stop for an unreasonable amount of time. Wright , 386 Wis.2d 495, 926 N.W.2d 157, ¶¶24-27 (citation omitted); State v. Floyd , 377 Wis. 2d 394, ¶23, 898 N.W.2d 560 (citing Rodriguez v. United States , --- U.S. ----, 135 S. Ct. 1609, 1615, 191 L.Ed.2d 492 (2015) ).
¶27 Absent from Wright and Floyd is the well-known Fourth Amendment jurisprudence that prohibits extending a traffic stop unless "during a valid traffic stop, the officer becomes aware of additional suspicious factors which are sufficient to give rise to an articulable suspicion that the person has committed or is committing an offense or offenses separate and distinct from the acts that prompted the officer's intervention in the first place," which would allow the stop to "be *174 extended and a new investigation begun." State v. Betow , 226 Wis. 2d 90, 94, 593 N.W.2d 499 (Ct. App. 1999) ; see also State v. Hogan , 2015 WI 76, ¶35, 364 Wis. 2d 167, 868 N.W.2d 124. As our court has previously decreed: "An expansion in the scope of the inquiry, when accompanied by an extension of time longer than would have been needed for the original stop, must be supported by reasonable suspicion." Hogan , 364 Wis. 2d 167, ¶35, 868 N.W.2d 124. Reasonable suspicion may not be based on an officer's "inchoate and unparticularized suspicion or 'hunch.' " State v. Post , 2007 WI 60, ¶10, 301 Wis. 2d 1, 733 N.W.2d 634 (citation omitted).
¶28 The "request" to search in both Floyd and this case were made after the reason for the stop was over. The officer in Floyd had finished writing the traffic citations and had returned to Floyd's car to give him his citations, but he first ordered Floyd out of the car, asked Floyd if he had any weapons, and when Floyd said "he did not," the officer searched Floyd "for his safety" whereupon he found drugs. Floyd , 377 Wis. 2d 394, ¶5, 898 N.W.2d 560. Floyd, a young black male, was stopped for a suspended registration, but Floyd made the mistake of having tinted windows, air fresheners, and was driving in a "high crime" area at 6:45 p.m. Id. , ¶¶2-3, 67 (Bradley, Ann Walsh, J., dissenting).
¶29 Here, the officer had also finished writing the traffic warning. Brown was stopped for not properly stopping at a stop sign, and when Officer Deering made contact with Brown, he noticed that Brown was not wearing his seatbelt. Majority, ¶¶3-4. Deering wrote a warning for the seat belt violation, and upon returning to Brown's car to give him the completed warning, Deering opened Brown's car door, asked him to step out, walked him to the squad car, asked him to place his hands behind his back, and asked Brown for permission *175 to search his person. Majority, ¶¶5-7, 9. Deering admitted that he did not consider his encounter with Brown to be a "high-risk" stop and that he had "no specific factors" that led him to be concerned that Brown had any weapons. Majority, ¶8. Brown, like Floyd, also happened to be a black male who was driving in the wrong place at the wrong time: in Fond du Lac with a rental car from a city (Milwaukee) that Deering considered a known "drug source city."
¶30 Common sense dictates that when an officer walks up to a person's car with a warning or minor traffic ticket that the reason for the seizure is over absent any new factors. See Wright , 386 Wis.2d 495, 926 N.W.2d 157, ¶9 ("Authority for the seizure ends when these tasks are, or reasonably should have been, completed."). All Deering had to do was hand Brown his license and warning ticket and send him on his way. Deering continued the seizure not for purposes of his safety but continued it *897 to see if he could find evidence of a crime despite having no reasonable suspicion that Brown had committed or was committing a crime.
¶31 Wright and Floyd take general statements from Rodriguez[2] and morph them into a global sanction allowing the removal and search of a person premised upon safety as being a part of the "mission" of every minor traffic stop. Wright , 386 Wis.2d 495, 926 N.W.2d 157, ¶¶8-9, 11, 25-27 (citing Rodriguez , 135 S. Ct. at 1616 ); Floyd , 377 Wis. 2d 394, ¶28, 898 N.W.2d 560. If I happened to be stopped for going five miles over the speed limit, I can *176 now be forced to walk from my vehicle with my hands ordered behind my back and stand over the hood of the officer's squad so the officer can "ask" to search me. See Floyd , 377 Wis. 2d 394, ¶¶27-28, 898 N.W.2d 560. Floyd found that this walk of shame does not unlawfully extend a stop because it is a part of the "mission" of any stop and is "negligibly burdensome." See id. , ¶¶26-28. I disagree. We should have the intellectual honesty to call the "mission" what it is-an independent, but unconstitutional ground to continue an investigation and not a mission to protect officer safety.
¶32 The rub of Wright and Floyd is that the removal and consent to frisk is left to officer discretion without any foundational requirement of reasonable suspicion to do so. If reasonable suspicion is not required, then we are authorizing and condoning the profiling of persons on something other than "additional suspicious factors which are sufficient to give rise to an articulable suspicion" that the person has or is committing a crime separate and distinct from the minor traffic violation. See Betow , 226 Wis. 2d at 94-95, 593 N.W.2d 499. If we are going to fairly apply Wright and Floyd , all persons stopped for a traffic violation should be required to exit their vehicle and be searched so as to eliminate the profiling that is made necessary by the reasoning of Wright and Floyd . If we desire integrity in our judicial system, then we must also apply the rationale of Wright and Floyd neutrally to all persons regardless of race, gender, age, nationality, religious or political affiliation, what city their car hails from, how many air fresheners they have, whether their vehicle has tinted windows, or whether they happen to live in a high-crime area because they cannot afford to live elsewhere, etc.
¶33 We have made mistakes before. In 1857, the United States Supreme Court wrote in *177 Scott v. Sandford (Dred Scott) , 60 U.S. 393, 407, 19 How. 393, 15 L.Ed. 691 (1857), that blacks were "beings of an inferior order" who had "no rights which the white man was bound to respect" and therefore no black person could be a citizen of the United States. Dred Scott 's repugnant decision was made over eighty years after our founders declared (at the peril of their lives) that "all men are created equal." Wright and Floyd continue, albeit implicitly, the bias that not all people are created equal by authorizing police to pick and choose who they will pull from cars for minor traffic violations when no articulable factors are present that the person has committed or is committing a crime. Wright and Floyd are flawed by focusing only on the government. Our Constitution was not written to protect the government or its agents; it was adopted to protect us from unfettered power in the hands of the government. Wright and Floyd flip constitutional analysis from a *898 bill of rights that protects the people to a bill of rights that allows the government to search and seize on nothing more than a hunch.
¶34 I also object to Wright and Floyd on practical grounds as we do not protect police officers by having them continue a seizure beyond its lawful purpose. See State v. Smith , 2018 WI 2, ¶82, 379 Wis. 2d 86, 905 N.W.2d 353 (Kelly, J., dissenting) ("Is it really necessary to point out that concerns over the officer's safety would vanish if he ended the seizure?"). Wright and Floyd judicially create an aggressive police act that unnecessarily extends a stop, thereby increasing the threat to the officer. Wright and Floyd manage to offend both constitutional and practical considerations.
¶35 I reiterate my concurrence in State v. Floyd , 2016 WI App 64, ¶¶28-31, 371 Wis. 2d 404, 885 N.W.2d 156 (Reilly, P.J., concurring), and I further adopt the reasoning in Justice Daniel Kelly's dissent in *178 Smith , 379 Wis. 2d 86, ¶¶53-88, 905 N.W.2d 353 (Kelly, J., dissenting). Our current rationale is not consistent with the intent of the United States Supreme Court's decision in Rodriguez , nor with the purpose of the Fourth Amendment. Officers, based upon our mandate, will be instructed by their training officer and advisors to utilize their ability to extend a stop even though the lawful reason for the stop is over, and the extension will not be for purposes of safety. Wright and Floyd have concocted an end run on the Constitution so as to get the "bad guys," knowing the innocent will never appear before us. The innocent will just lose faith in their government.

"Worked quickly" is in reference to the mandate found in Rodriguez v. United States , --- U.S. ----, 135 S. Ct. 1609, 1614-15, 191 L.Ed.2d 492 (2015) (last alteration in original; citations omitted), that officers cannot "prolong[ ] [a stop] beyond the time reasonably required to complete th[e] mission" or "measurably extend the duration of the stop" "absent the reasonable suspicion ordinarily demanded to justify detaining an individual."

Statements including that the government's interest in officer safety "stems from the mission of the stop itself," that "[t]raffic stops are 'especially fraught with danger to police officers,' " and that "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." Rodriguez , 135 S. Ct. at 1616 (citation omitted).