COURT OF APPEALS
DECISION
DATED AND FILED

November 1, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP435-CR**

Cir. Ct. No. **2016CF3891**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT-PETITIONER,

V.

JAMES TIMOTHY GENOUS,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: DENNIS R. CIMPL, Judge. *Affirmed*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

¶1 DUGAN, J. James Timothy Genous appeals from a judgment of conviction, following a guilty plea, to one count of felon in possession of a firearm. In an unpublished opinion, we reversed the circuit court's denial of Genous' motion to suppress, and we concluded that the officers who stopped

Genous lacked reasonable suspicion to conduct the stop. *See State v. Genous* (*Genous I*), No. 2019AP435-CR, unpublished slip op. (WI App April 28, 2020). The State petitioned the Wisconsin Supreme Court for review. Our supreme court disagreed and concluded that the officers did in fact have reasonable suspicion to stop Genous. *See State v. Genous* (*Genous II*), 2021 WI 50, 397 Wis. 2d 293, 961 N.W.2d 41. This case is now on remand from our supreme court, and we consider the remaining issues presented, namely whether the search of Genous' socks and shoes or the search of Genous' vehicle was unlawful and requires suppression of the firearm. For the reasons set forth below, we now affirm.

## BACKGROUND

¶2  At the hearing on the motion to suppress the firearm that the officers found during the search of his vehicle, Police Officer Adam Stikl testified that he stopped Genous on August 28, 2016, at 3:36 a.m., after observing Genous' vehicle parked outside the residence of a known heroin user and further observing Genous drive away, after a female from that residence entered Genous' vehicle and then left within a matter of seconds. In *Genous II*, 397 Wis. 2d 293, ¶¶2-3, our supreme court described that transaction as follows:

> At 3:36 a.m. on August 28, 2016, James Genous sat in a parked, running vehicle on a residential street in West Allis with its headlights turned on. Genous momentarily turned off the headlights, and a woman emerged from the house he was parked in front of. She entered the vehicle through the front passenger door and remained in the car for 10 to 15 seconds. The woman then exited the vehicle and ran back into the house. A few seconds later, the vehicle's headlights turned back on and the car pulled away.
>
> West Allis Patrol Officer Adam Stikl watched these events from an unmarked squad car half a block away. Two weeks prior, he received an intra-department email regarding [Kimberly], a resident of the single-family home

> Genous was parked in front of. [Kimberly] was a known heroin and narcotics user who previously worked with the department. The email explained that the department was no longer working with [Kimberly] and that officers were to "keep an eye on her because she does obviously still use." After receiving the email, Officer Stikl looked up [Kimberly]'s physical description on his department's local system. As Officer Stikl watched the brief, nighttime interaction when the events leading to this case took place, he observed that the woman entering and exiting Genous' car matched [Kimberly]'s physical description.[1]

Officer Bernie Molthen also testified at the suppression hearing that during the stop he discovered a firearm under the driver's seat of Genous' vehicle.

¶3    Genous filed a motion to suppress the firearm that the officers found during the search of his vehicle. The circuit court held a hearing on the motion at which the officers testified and the dash cam video of the stop was introduced into evidence. The circuit court denied Genous' motion, and Genous appealed.

¶4    On appeal, we reversed the circuit court. We concluded that the firearm must be suppressed because the officers lacked reasonable suspicion to conduct the stop, and we determined that the officers placed too heavy of an emphasis on the brief interaction with a known drug user and the location of the interaction. *Genous I*, No. 2019AP435-CR, ¶¶15-18.

¶5    The State petitioned the Wisconsin Supreme Court for review, and on review, our supreme court concluded that the officers had reasonable suspicion to conduct the stop and remanded the case for us to consider the remaining issues raised by Genous in his appeal. *Genous II*, 397 Wis. 2d 293, ¶13. The court

---

[1] We use a pseudonym to refer to the individual seen in Genous' car that night to protect her identity. In its decision in *State v. Genous* (*Genous II*), 2021 WI 50, 397 Wis. 2d 293, 961 N.W.2d 41, our supreme court used her initials.

concluded that Officer Stikl's suspicion that he had witnessed a drug transaction was "objectively reasonable" and that Officer Stikl "could reasonably infer quite a bit about the events he observed that night" based on "his training, experience, and department communications." *Id.*, ¶11. The court described Officer Stikl's knowledge as follows:

> Informed by his training, experience, and department communications, Officer Stikl could reasonably infer quite a bit about the events he observed that night. He knew that drug transactions often occur during brief exchanges in vehicles, which was consistent with the 10-15 second contact in Genous' car. He also knew that a brief meeting in a vehicle at 3:36 a.m., immediately after the vehicle's headlights are turned off, and in an area with a reputation for drug-trafficking, are potential indicators of illegal activity. And perhaps most significantly, Officer Stikl had good reason to believe that the woman Genous met in his vehicle was a known drug user with whom his department had a documented history.

*Id.* (footnotes omitted). It then stated that "[a]ll these factors, viewed collectively in the eye of a trained and experienced law enforcement officer, support the conclusion that Officer Stikl reasonably suspected a drug transaction had occurred." *Id.*

¶6 On remand, we now consider Genous' remaining arguments as to whether the search of his socks and shoes or the search of his vehicle was unlawful and required suppression of the firearm. Additional relevant facts will be set forth in the discussion as necessary.

## DISCUSSION

¶7 We apply the same two-step standard of review to a circuit court's denial of a motion to suppress and a review of a search under the Fourth Amendment. We uphold the circuit court's factual findings unless those findings

are clearly erroneous, and we review independently the application of constitutional principles to those facts. *See State v. Carroll*, 2010 WI 8, ¶17, 322 Wis. 2d 299, 778 N.W.2d 1; *State v. Lonkoski*, 2013 WI 30, ¶21, 346 Wis. 2d 523, 828 N.W.2d 552.

### I. The Search of Genous' Socks and Shoes

¶8     During the hearing on the motion to suppress, Officer Stikl testified that when he stopped the vehicle, he approached the driver's side window and obtained Genous' identification, and returned to his squad car to process his identification. While Officer Stikl was processing Genous' identification, Officer Molthen and a third officer who had arrived at the scene of the stop, asked Genous to exit his vehicle after Officer Molthen observed Genous make a furtive movement leaning down towards the floor of his car.[2] Genous complied. The officers further instructed Genous to sit on the curb and remove his socks and shoes. On appeal, Genous argues that this search of his socks and shoes while he sat on the curb was unlawful and renders the subsequent search of his vehicle unlawful. Genous phrases his argument related to the search of his socks and shoes as one in which the officers exceeded the permissible purpose of the stop, and he argues that the officers needed probable cause to conduct a search of his socks and shoes.

¶9     The State argues that the search of Genous' socks and shoes was a lawful protective search for weapons. Alternatively, the State argues that, even if

---

[2] Although Officer Molthen testified that the third officer asked Genous to exit his vehicle, during his testimony Officer Stikl testified that he asked Genous to exit his vehicle after Officer Molthen told him about Genous' furtive movements. We conclude that whether Officer Stikl or the third officer asked Genous to exit his vehicle does not affect our decision.

the search of Genous' socks and shoes was illegal, it was not a "but for" cause of the search of his car that produced the firearm, and therefore, the search of Genous' socks and shoes does not require suppression of the firearm subsequently found during the search of the vehicle. We agree with the State.

¶10 Pat-down searches or frisks are "justified when an officer has a reasonable suspicion that a suspect *may* be armed." **State v. Morgan**, 197 Wis. 2d 200, 209, 539 N.W.2d 887 (1995) (emphasis added). "The 'reasonable suspicion' must be based upon 'specific and articulable facts,' which, taken together with any rational inferences that may be drawn from those facts, must establish that the intrusion was reasonable." **State v. McGill**, 2000 WI 38, ¶22, 234 Wis. 2d 560, 609 N.W.2d 795 (citation omitted). "[T]he determination of reasonableness is made in light of the totality of the circumstances known to the searching officer." **Morgan**, 197 Wis. 2d at 209. Looking to the totality of the circumstances here, we conclude that the officers had a reasonable suspicion that Genous may have been armed, which justified the search of Genous' socks and shoes.

¶11 It has already been established that Genous was lawfully stopped based on reasonable suspicion that a drug transaction had occurred. *See* **Genous II**, 397 Wis. 2d 293, ¶13. As our supreme court described in **Genous II**, Genous had been parked outside the house of a known heroin user at 3:36 a.m. and turned off the headlights of his vehicle. *Id.*, ¶11. Then, an individual matching the description of Kimberly, the known heroin user, briefly met with Genous inside the vehicle, and after that individual left his vehicle and went back inside the residence, Genous drove away. *Id.* The **Genous II** court also noted that the transaction occurred "in an area with a reputation for drug-trafficking." *Id.* The court stated that those facts are "potential indicators of illegal activity." *Id.*

6

¶12 Furthermore, Officer Stikl testified at the suppression hearing that he had observed several cell phones, cigar wrappers, and hand sanitizer in plain view in Genous' vehicle when he first approached the vehicle and he was speaking with Genous. He further testified that, based on his training and experience, these were items commonly used in drug-related activity. Officer Stikl also testified that he questioned Genous about the individual who met with him in his vehicle. According to Officer Stikl, Genous initially answered that he was meeting his mistress, but his mistress failed to show up. However, when Officer Stikl told Genous that he observed a female enter the vehicle, Genous admitted that a woman met with him in his vehicle, but he did not provide a name for her. Officer Stikl then told Genous that he pulled him over because he believed Genous was involved in a drug transaction with the woman. He testified that Genous denied he engaged in a drug transaction and said that the woman wanted some money and she got upset when he did not give her any, and she left the car and went back into the house. As Officer Stikl continued to question Genous, Genous finally stated that the woman's first name was Kimberly, but he did not know her last name.[3] We note that not being truthful with a police officer is also a potential indicator of illegal activity.

¶13 Officer Molthen also testified at the suppression hearing. He testified that when he arrived on the scene, he positioned himself at the rear passenger side of the vehicle so he could observe Genous through the rear window. He explained that as a back-up officer his role was to watch to see if Genous was making any movements to access any weapons and to see if there was

---

[3] We note that the first name provided by Genous is the same first name as the heroin user who was known to police to have lived in the residence where Genous was parked.

anything illegal in plain view in the vehicle. He further testified that while he was watching Genous, he observed him make several movements with his right shoulder—dipping his right shoulder down "like he was reaching for something underneath his seat or trying to place something underneath the seat." Officer Molthen testified that he was concerned that Genous might be accessing a weapon to assault officers. As noted above, after observing Genous' furtive movements, Officer Molthen and a third officer who had arrived on the scene, asked Genous to exit his vehicle.

¶14 We note that "weapons are often 'tools of the trade' for drug dealers," and "those who deal drugs often keep weapons on their person or nearby." *State v. Guy*, 172 Wis. 2d 86, 96, 492 N.W.2d 311 (1992) (citation omitted); *see also State v. Johnson*, 2007 WI 32, ¶38, 299 Wis. 2d 675, 729 N.W.2d 182 (recognizing that "selling drugs" is "a crime officers have known to be associated with the possession of deadly weapons"). Moreover, our supreme court in *Guy* stated that it recognized that "[t]he violence associated with drug trafficking today places law enforcement officers in extreme danger." *Guy*, 172 Wis. 2d at 96 (citation omitted). Additionally, our supreme court recognized in *State v. Richardson* that "[s]everal cases have found that drug dealers and weapons go hand in hand[.]" *Id.*, 156 Wis. 2d 128, 144, 456 N.W.2d 830 (1990). In fact, our supreme court has previously noted that officers have searched for

weapons as small as razor blades when investigating suspected drug activity.[4] *See Guy*, 172 Wis. 2d at 96-97. The search of Genous' socks and shoes also occurred at night when an officer's visibility is reduced and there are fewer people to observe the encounter. *McGill*, 234 Wis. 2d 560, ¶32. Thus, we conclude that considering the totality of the circumstances, the officers had a reasonable suspicion that Genous may be armed and the search of Genous' socks and shoes was a lawful protective search for weapons that Genous may have hidden in his socks or shoes.

¶15    Nevertheless, we next address the State's argument that, even if the search of Genous' shoes and socks was illegal, this illegal conduct would not entitle him to suppression of the gun that the police found in his car because there is no causal link between the search of Genous' shoes and socks and the search of his car. In other words, the State argues that the search of Genous' socks and shoes was not a "but for" cause of the search of the vehicle and thus, any assumed illegality in the search of Genous' socks and shoes did not taint the subsequent search of the vehicle.

---

[4] We note that the Dissent faults the Majority for recognizing that Genous could have been hiding a razor blade in his socks or shoes which could be used as a weapon against the officers. Dissent, ¶4. First, as noted, our supreme court in *Guy* recognized that officers do search for razor blades because "suspects could use [them] as weapons." *See State v. Guy*, 172 Wis. 2d 86, 96-97, 492 N.W.2d 311 (1992). Further, in *State v. Denk*, 2008 WI 130, ¶59, 315 Wis. 2d 5, 758 N.W.2d 775, the court explained that it was reasonable for officers to search an eyeglass case because it was capable of containing a small weapon, such as a knife or a razor blade. Moreover, we must consider the totality of the circumstances, which in this case includes, as our supreme court noted in *Genous II*, 397 Wis. 2d 293, ¶13, that the officers had reasonable suspicion that Genous engaged in a drug transaction. Further, he was not truthfully answering Officer Stikl's questions, Officer Stikl saw other items commonly associated with drug dealing—multiple cell phones, cigar wrappers, and hand sanitizer—and most significantly, his furtive movements suggested he was attempting to hide a weapon in his socks or shoes. These facts also are indicators of illegal activity—here, dealing drugs.

¶16    Thus, the issue that we address then is whether the exclusionary rule applies to the facts in this case.  In ***State v. Carroll***, 322 Wis. 2d 299, ¶19, our supreme court explained that

> the exclusionary rule requires courts to suppress evidence obtained through the exploitation of an illegal search or seizure.  ***Wong Sun v. United States***, [371 U.S. 471, 488] (1963).  This rule applies not only to primary evidence seized during an unlawful search, but also to derivative evidence acquired as a result of the illegal search, unless the State shows sufficient attenuation from the original illegality to dissipate that taint.  ***Murray v. United States***, [487 U.S. 533, 536-37] (1988).

However, in ***Hudson v. Michigan***, 547 U.S. 586, 591 (2006), the United States Supreme Court stated that "[s]uppression of evidence, however, has always been our last resort, not our first impulse."  It explained, "The exclusionary rule generates substantial social costs, which sometimes include setting the guilty free and the dangerous at large.  We have therefore been cautious against expanding it[.]" ***Id.*** at 591 (citations, brackets, and quotations omitted).

¶17    The ***Hudson*** Court further explained that "[w]hether the exclusionary sanction is appropriately imposed in a particular case … is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" ***Id***. at 591-92 (alteration in original; citation omitted).  It then stated that "[i]n other words, exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence.  Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression." ***Id.*** at 592.

¶18    In ***State v. Hogan***, 2015 WI 76, ¶66, 364 Wis. 2d 167, 868 N.W.2d 124, citing ***Hudson*** and ***Harris***, our supreme court noted that attenuation analysis is not necessary in all cases.  It then stated, "[A]ttenuation analysis is only

appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal governmental activity.'" *Id.* (quoting *New York v. Harris*, 495 U.S. 14, 19 (1990)). The court then explained, "If the unlawful police conduct was not a 'but-for' cause of the search, attenuation analysis is unnecessary because the consent [here the search of Genous' car] is not tainted by the unlawful conduct in such a case." *See id.* (citing *Hudson*, 547 U.S. at 592 ).

¶19     In *Hudson*, although the police had a lawful search warrant to enter and search a residence, Michigan conceded that the entry constituted a knock-and-announce violation. Thus, the entry was unlawful, and therefore the issue was the proper remedy. *Id.*, 547 U.S. at 590. The Court concluded that

> [i]n this case, of course, the constitutional violation of an illegal manner of entry was not a but-for cause of obtaining the evidence. Whether that preliminary misstep had occurred *or not*, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house.

*Id.* at 592. Thus, it concluded that the violation of the knock-and-announce rule did not require the suppression of the evidence found during the search. *Id.* at 593, 599.

¶20     As the State points out, the issue that we address then is whether the search of Genous' socks and shoes was the "but-for" cause for the police finding the gun in his car. The State argues that the police did not discover any evidence in Genous' socks and shoes, and nothing was produced during the search of his socks and shoes that led the officers to search Genous' vehicle and find the firearm. It then argues because but-for causation is lacking, Genous is missing this necessary condition of suppression, and thus, the State need not prove that the

search of Genous' car was attenuated from the search of his socks and shoes. We agree and conclude that, even if the search of Genous' socks and shoes constituted unlawful police conduct, it was not a "but-for" cause of the search of his car because the search was not tainted by the search of his socks and shoes. *See Hudson*, 547 U.S. at 592. Similar to the facts in *Hudson*, whether that preliminary misstep—searching the socks and shoes—had occurred *or not*, the police had, as we discuss below, probable cause to search Genous' car for drugs, and therefore would have discovered the gun in his car.

¶21 In his reply brief, Genous asserts that the State misses the point of his argument. First, he argues that the illegal search of his socks and shoes rendered the *Terry*[5] stop itself unconstitutional. He then asserts that any evidence the police discovered from then on was fruit of a poisonous tree—the poisonous tree here being the unconstitutional stop that was ongoing. However, Genous does not cite any authority for his proposition that the illegal search of his socks and shoes rendered the *Terry* stop itself unconstitutional, nor does he develop the argument. In other words, he has not developed or presented an argument telling us why we should accept his conclusory proposition, and he has not referred us to any legal authority supporting the statement. We need not address undeveloped arguments. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

¶22 Furthermore, we recognize that Genous failed to refute the State's argument on this point. He merely contends that the State's reliance on *Hogan* is unavailing because the illegal extension of the traffic stop ended when the police

---

[5] *Terry v. Ohio*, 392 U.S. 1 (1968).

told Hogan he could leave and therefore, the illegal stop could not have been the but-for cause of the consent. We note that it is true that the court in *Hogan* did state that because the illegal extension of the traffic stop ended, the illegal stop could not have been the but-for cause of the consent. However, Genous' argument is based on his conclusory, unsupported argument "that the illegal search of his socks and shoes rendered the *Terry* stop itself unconstitutional." As discussed above, because the search of Genous' socks and shoes was not a but-for cause of the police finding the gun in his car, the search was not tainted by the search of his socks and shoes. Genous' argument does not address the holdings in *Hudson* or *Harris* on which our supreme court's holding in *Hogan* is based. Thus, he has failed to refute the State's argument, and therefore, he has conceded the State's argument. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578.

¶23 Consequently, the subsequent search of Genous' vehicle was in no way influenced, or "tainted," by any assumed illegality in the search of Genous' socks and shoes. *See Hogan*, 364 Wis. 2d 167, ¶66 (noting that unlawful police activity does not taint a subsequent search if it is not a "but for" cause of the search). Accordingly, we conclude that, even if the search of Genous' socks and

shoes was illegal, that conduct does not require suppression of the firearm found during the search of the vehicle. *See id.*, ¶9.[6]

## II. The Search of Genous' Vehicle

¶24 Subsequent to the search of Genous' socks and shoes, Officer Molthen opened the driver's side door of Genous' vehicle to further examine the items Officer Stikl observed in the vehicle, and he discovered a firearm under the driver's seat. On appeal, Genous argues that the firearm must be suppressed because this search of his vehicle was unlawful—he argues that the officers lacked probable cause to open the door of his car and search his vehicle. We disagree, and we conclude that the officers had probable cause to search Genous' vehicle for illegal drugs based on Officer Stikl's observation of Genous' interaction with Kimberly, his further observation of several cell phones, cigar wrappers, and hand sanitizer, which were in plain view at the time Officer Stikl first approached

---

[6] The Dissent addresses this issue by stating that *State v. Hogan*, 2015 WI 76, 364 Wis. 2d 167, 868 N.W.2d 124, is not applicable to this case because *Hogan* involved the voluntariness of a defendant's statements given after illegal police activity. Dissent, ¶9. It then states, "Consent analysis proceeds under a distinct framework." Dissent, ¶9. The Dissent then states that in *Hogan*, the court held that the illegal police activity did not taint the defendant's subsequent consent because the stop was over at the time the defendant gave consent, but in contrast to this case, there is no evidence that the stop was over and Genous was free to leave. Dissent, ¶10. However, the Dissent misconstrues the holding in *Hogan*, and the cases it relies on—*Hudson v. Michigan*, 547 U.S. 586 (2006), and *New York v. Harris*, 495 U.S. 14 (1990). Pursuant to those cases, we consider whether the assumed unlawful police conduct—the search of Genous' socks and shoes—was a but-for cause of the search of his car, and if it is not, the search of his car is not tainted by the assumed unlawful conduct in such a case. The focus is not on the "stop," which our supreme court found in *Genous II* was lawful, but on the assumed unlawful conduct of searching Genous' socks and shoes and whether that was the but-for cause of the police searching his car. It was not—like the facts in *Hudson*. Here, the police had probable cause to search Genous' car for drugs and would have done so with or without finding any evidence of drugs or a weapon on Genous.

Genous in his vehicle,[7] Genous not answering Officer Stikl's questions truthfully, and Officer Molthen's observing Genous' furtive movements in his vehicle.

¶25 "[L]aw enforcement officers may search an entire motor vehicle without a warrant if there is probable cause to believe that the vehicle contains contraband." *State v. Matejka*, 2001 WI 5, ¶23, 241 Wis. 2d 52, 621 N.W.2d 891. Probable cause "is neither a technical nor a legalistic concept," and is "a flexible common-sense standard." *State v. Pozo*, 198 Wis. 2d 705, 711, 544 N.W.2d 228 (Ct. App. 1995) (citation omitted). Probable cause to search requires a "quantum of evidence" that would lead a reasonable officer to believe that "evidence of a crime will be found." *State v. Secrist*, 224 Wis. 2d 201, 209, 589 N.W.2d 387 (1999). Overall, probable cause "requires only a probability or substantial chance of criminal activity"; it is "not a high bar." *District of Columbia v. Wesby*, 583 U.S. ___, 138 S. Ct. 577, 586 (2018) (citations omitted).

¶26 First, our supreme court concluded that Officer Stikl's suspicion that the interaction that he witnessed in Genous' car with a known heroin user was a drug transaction, which was objectively reasonable for the reasons stated above. *See Genous II*, 397 Wis. 2d 293, ¶13. Additionally, Officer Stikl observed that Genous had items commonly associated with drug activity in plain view in his vehicle, including multiple cell phones, hand sanitizer, and cigar wrappers. Specifically, Officer Stikl testified at the suppression hearing that hand sanitizer is

---

[7] The State additionally argues that the police observed the firearm on the floor of Genous' vehicle before opening the car door and searching his vehicle and that, therefore, the police had reasonable suspicion to search Genous' vehicle for weapons. Having concluded that the search of Genous' vehicle was lawful on the basis of probable cause to search the vehicle for evidence of drug activity, we do not address these additional arguments raised by the State. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989).

often used by drug dealers to clean their hands after they remove drugs concealed in their anal area and cigar wrappers are often used to make blunts for smoking marijuana. Further, Officer Molthen observed Genous dipping his right shoulder down like he was reaching for something underneath his seat or trying to place something underneath his seat. The officers then asked Genous to step out of the car. Officer Stikl testified that after processing his identification and after Officer Molthen told him about Genous' furtive movements in his car, he believed that a drug transaction probably occurred—between Genous and Kimberly while she was in his car.

¶27 Taken together, these facts satisfy the quantum of evidence needed to lead a reasonable officer to believe that Genous was involved in drug-related activity, and the officers were justified in opening the door of the vehicle to determine if the car or the items Officer Stikl observed in the car contained any evidence of drugs. *See Pozo*, 198 Wis. 2d at 713 (concluding that the officer could reasonably infer based on the circumstances and his training and experience that the sandwich bag contained marijuana). Therefore, we conclude that the search of Genous vehicle, during which the firearm was discovered, was a lawful search.

## CONCLUSION

¶28 In sum, we conclude that the circuit court properly denied Genous' motion to suppress evidence of the firearm found in his vehicle. The search of Genous' socks and shoes was lawful as a protective search for weapons and, in any event, was not a "but for" cause of the search of Genous' vehicle that could invalidate the subsequent search of Genous' vehicle. Furthermore, the search of Genous' vehicle during which the firearm was found was supported by probable

16

cause of drug activity and was therefore, a lawful search. Accordingly, the circuit court properly denied Genous' motion to suppress, and we affirm.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.

No.    2019AP435(D)

¶29    DONALD, P.J. (*dissenting*).  Contrary to the Majority, I would hold that the officers exceeded the permissible scope of a ***Terry*** stop.  Based on my review of the video of the stop, it is evident that the officers were engaged in a fishing expedition for contraband.  I write briefly to make three points.

¶30    First, I would find that the police exceeded the permissible scope of the pat-down search by ordering Genous to take off his shoes and his socks.  It is well-established that a police officer may conduct a pat-down when an officer has a reason to believe that a suspect is armed and dangerous.  *See, e.g.,* ***Terry v. Ohio***, 392 U.S. 1, 30 (1968).  The permissible scope of this type of search, however, is narrow.  "The search for weapons approved in ***Terry*** consisted solely of *a limited patting of the outer clothing* of the suspect for concealed objects which might be used as instruments of assault."  ***Sibron v. New York***, 392 U.S. 40, 65 (1968) (emphasis added); *see also*, ***Minnesota v. Dickerson***, 508 U.S. 366, 375 (1993).  Ordering a person to take off his or her socks and shoes is a far cry from the "limited patting of the outer clothing."

¶31    Moreover, there is nothing in the record reflecting that ordering Genous to remove his shoes and his socks was reasonably necessary for an effective search in this case.  *See **State v. Triplett***, 2005 WI App 255, ¶¶14, 19, 288 Wis. 2d 515, 707 N.W.2d 881 (holding that where the defendant had a "bulky frame and heavy clothing" shaking a defendant's waistband by the belt loops was a reasonable means of facilitating an effective pat-down).  For example, there is no indication in the record that Genous was wearing heavy or bulky boots which might conceal a weapon.  Nor does the record reflect that his shoes were untied or

ill-fitting which might suggest a hidden weapon accessible to Genous. And, even if the removal of Genous's shoes was necessary, it is unclear why a pat-down for weapons could not be conducted over his socks.

¶32 The Majority suggests that ordering Genous to take off his shoes and socks was necessary because a small razor blade could be hidden in his shoes or socks. *See* Majority, ¶14. By this logic, however, the police could order a person to take off clothing anywhere a small blade might be hidden, such as a bra or underwear. This would seemingly obliterate any limitation on the scope of a pat-down search by the police.

¶33 Second, the Majority discounts any illegality of the pat-down search because the officers did not discover any incriminating evidence on Genous. *See* Majority, ¶20. I disagree with the Majority's analysis.

¶34 There are three exceptions to the exclusionary rule that involve the causal relationship between an unconstitutional act and the discovery of evidence—the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. *See **Utah v. Strieff***, 579 U.S. 232, 238 (2016). The State's brief does not reference the independent source doctrine or the inevitable discovery doctrine. This leaves the attenuation doctrine.

¶35 The attenuation doctrine provides that "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (citation omitted). In ***Brown v. Illinois***, 422 U.S. 590 (1975), the United States Supreme Court held that when determining whether the attenuation doctrine applies, a court should

examine three factors: (1) the temporal proximity between the unconstitutional conduct and the discovery of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. ***Id.*** at 604-05, *see also* ***Strieff***, 579 U.S. at 239.

¶36 The State contends that an attenuation analysis is unnecessary here and does not address the ***Brown*** attenuation factors. The Majority adopts this argument based on ***New York v. Harris***, 495 U.S. 14 (1990), and ***Hudson v. Michigan***, 547 U.S. 586 (2006). *See* Majority, ¶¶17-19. These cases, however, are distinguishable. ***Harris*** involved the scope of the exclusionary rule when the State seeks to use a statement made by the defendant outside his home after the defendant was arrested inside his home in violation of ***Payton v. New York***, 445 U.S. 573 (1980). *See* ***Harris***, 495 U.S. at 21; ***State v. Felix***, 2012 WI 36, ¶¶41, 51, 339 Wis. 2d 670, 811 N.W.2d 775 (adopting "the ***Harris*** exception to the exclusionary rule for certain evidence obtained after a ***Payton*** violation" and stating that ***Harris*** "provides a narrow rule"). ***Hudson*** involved the scope of the exclusionary rule where the police committed a knock-and-announce violation. *See* ***id.***, 547 U.S. at 594, 599. Genous's case does not involve either a ***Payton*** violation or a knock-and-announce violation.

¶37 The Majority notes that ***Harris*** and ***Hudson*** were cited in ***State v. Hogan***, 2015 WI 76, 364 Wis. 2d 167, 868 N.W.2d 124. Majority, ¶18. ***Hogan*** too is distinguishable. ***Hogan*** addressed whether an illegal detention tainted the defendant's subsequent consent to search. ***Id.***, 364 Wis. 2d 167, ¶56. "Consent analysis proceeds under a distinct framework[.]" ***Id.***, ¶57. This case does not involve the voluntariness of a defendant's statements given after illegal police activity.

3

¶38 In addition, in *Hogan*, our supreme court held that the illegal police activity did not taint the defendant's subsequent consent to search because the stop was *over* at the time the defendant gave consent to search. *Id.*, ¶¶68-69, 71. In contrast, here, the traffic stop was ongoing at the time the officers searched Genous's shoes and socks, and then his car. There is no indication that the stop was over or that Genous was free to leave.

¶39 Thus, given that *Hudson*, *Harris*, and *Hogan* are distinguishable, and in the absence of a development of an argument of the *Brown* attenuation factors by the State, I would conclude that the firearm found following the pat-down should be suppressed.

¶40 Finally, I disagree with the Majority's conclusion that Genous has conceded the State's argument. *See* Majority, ¶22. My review of Genous's reply brief reflects that he addressed the State's "but for" argument. Concessions should not be inferred lightly, especially in a case where a party has explicitly addressed an argument.

¶41 Therefore, for the reasons stated above, I respectfully dissent.